**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

FILED-CLERK
U.S. DISTRICT COURT

04 JUN 28 PM 4:53

TX. EASTERN-MARSHALL

BY _MVelvin_

| | | |
|---|---|---|
| IN RE FLEMING COMPANIES | § | |
| SECURITIES LITIGATION | § | MDL NO. 1530 |
| | § | |
| | § | |
| This Document Relates To: All Actions | § | Judge Ward |
| | § | |
| | § | |


## Fourth Consolidated Amended Class Action Complaint

## TABLE OF CONTENTS

I. Nature of the Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Jurisdiction and Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III. The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    Lead Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    1933 Act Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.    Non-Party Fleming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    D.    1934 Act Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    E.    1933 Act Individual Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    F.    Defendant Deloitte & Touche . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    G.    Underwriter Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV. Class Action Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

V. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    A.    Fleming struggles in the 1990s. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    B.    Fleming announces a "Strategic Plan." . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    C.    Fleming touts its strategic plan to the market. . . . . . . . . . . . . . . . . . . . . . 24

    D.    Analysts and investors viewed Fleming's retail price-impact plan
        as important to Fleming's overall performance. . . . . . . . . . . . . . . . . . . . 30

VI.    Substantive Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    A.    Defendants deliberately or recklessly misstated Fleming's
        earnings in 2001 and 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        1.    Defendants deliberately or recklessly misstated Fleming's
            retail sales and earnings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

            a.    Revenue and margin manipulations by Fleming retail. . . . . . . . 34

1

| | b. | Manipulation of same store or comparable store sales. . . . . . . . 40 |

| | c. | Improper classification of recurring expenses.  . . . . . . . . . . . . . 45 |

2.  Defendants deliberately or recklessly misstated Fleming's wholesale segment's earnings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

| | a. | Fleming manipulates its wholesale earnings. . . . . . . . . . . . . . . . 47 |

| | b. | The experience of Ernst & Young shows the culture of manipulation and lack of controls at Fleming during the Class Period. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50 |

| | c. | Fleming's wholesale segment imposes unauthorized, improper, and unsustainable vendor deductions. . . . . . . . . . . . . 51 |

| | d. | Fleming inflates earnings with a scheme to obtain price reductions for fictitious Store No. 11.  . . . 60 |

| | e. | Fleming manipulates earnings by improperly failing to recognize inventory losses.  . . . . . . . . . . . . . . . . . . . . . . . . . 62 |

| | f. | Improper classification of improperly deferred prior-year expenses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64 |

B.  Defendants' false and misleading statements during the Class Period. . . . . . . . . 65

1.  Announcement of first quarter 2001 results. . . . . . . . . . . . . . . . . . . . . . 65

2.  10 1/8% senior notes exchange offering. . . . . . . . . . . . . . . . . . . . . . . . . 68

3.  Announcement of second quarter 2001 results. . . . . . . . . . . . . . . . . . . . 68

4.  August 20, 2001 press release. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

5.  September 2001 press releases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

6.  Announcement of third quarter 2001 results. . . . . . . . . . . . . . . . . . . . . . 72

7.  November 5, 2001 *DSN Retailing Today* article. . . . . . . . . . . . . . . . . . 74

8.  5 1/4% convertible senior note exchange offering. . . . . . . . . . . . . . . . . 76

9.  A failed merger. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

10.  Announcement of fourth quarter 2001 results. . . . . . . . . . . . . . . . . . . . . 77

11.   2001 Form 10-K. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

12.   10 5/8% Series D senior subordinated notes exchange offering. . . . . . . 81

13.   April 16 and 22, 2002 press releases. . . . . . . . . . . . . . . . . . . . . . . . . . 82

14.   First quarter 2002 earnings announcements. . . . . . . . . . . . . . . . . . . . . 83

15.   9.2 million share common stock and $200 million 9 1/4%
      senior note public offering. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

16.   June 18, 2002 press release. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

17.   July 9, 2002 press release. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

18.   Second quarter 2002 announcements. . . . . . . . . . . . . . . . . . . . . . . . . . 95

19.   September 4, 2002 *Dow Jones* article. . . . . . . . . . . . . . . . . . . . . . . . . 101

20.   September 5, 2002 *Wall Street Journal* article. . . . . . . . . . . . . . . . . . 104

21.   September 5, 2002 analyst conference call. . . . . . . . . . . . . . . . . . . . . . 104

22.   Fleming announces the divestment of its retail operations. . . . . . . . . . . 110

23.   Fleming files an amended 10-Q for the first quarter of 2002 . . . . . . . . 111

24.   Fleming files an amended 10-Q for second quarter 2002 . . . . . . . . . . . 111

25.   Fleming files an amended 10-K for 2001 . . . . . . . . . . . . . . . . . . . . . . 112

26.   Third-Quarter 2002 Earnings Announcement. . . . . . . . . . . . . . . . . . . . 113

27.   The SEC commences an informal investigation of Fleming. . . . . . . . . 119

28.   Fleming announces a massive retail loss. . . . . . . . . . . . . . . . . . . . . . . 119

29.   Fleming announces the loss of the Kmart contract. . . . . . . . . . . . . . . . 122

30.   The SEC upgrades its investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . 124

C.    Post Class Period Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

1.    Fleming's credit ratings are downgraded. . . . . . . . . . . . . . . . . . . . . . . 124

2.  Defendant Hansen resigns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

3.  Fleming files for bankruptcy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

4.  Fleming announces it will restate earnings for 2001 and 2002. . . . . . . 125
5.  Fleming announces that it will restate earnings for 2000. . . . . . . . . . . 126

VII.  Fleming's False Financial Reporting During the Class Period . . . . . . . . . . . . . . . . . . . . 127

VIII. Deloitte &Touche's Participation in the Scheme and Its Knowing or
Reckless Departures from GAAS and GAAP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

A.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

B.  D&T's 2001 Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
1.  D&T's auditor's opinion was materially false and misleading
because the financial statements were not presented in
accordance with GAAP, nor were they audited in accordance
with GAAS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

2.  D&T failed to exercise due professional care and violated
numerous other accounting principles. . . . . . . . . . . . . . . . . . . . . . . 136

3.  D&T failed to identify a lack of internal controls at
Fleming. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

4.  D&T ignored Fleming's failures to disclose. . . . . . . . . . . . . . . . . . . 143

5.  D&T violated GAAS audit planning principles. . . . . . . . . . . . . . . . . 144

6.  D&T failed to disclose the truth at the annual shareholders'
meeting on May 14, 2002 in Lewisville. . . . . . . . . . . . . . . . . . . . . . 145

C.  D&T's Review Reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

D.  Deloitte & Touche knew or recklessly disregarded numerous facts
that showed that Fleming's financial statements were materially
false and misleading. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

1.  Deloitte & Touche knew or recklessly disregarded
the fact that Fleming's internal controls were virtually
non-existent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

2.  Deloitte & Touche knew or recklessly disregarded
the fact that Fleming violated GAAP by improperly

recognizing income from contingent deductions prior
to realization. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

3.  Deloitte & Touche knew or recklessly disregarded
the fact that Fleming improperly inflated comparable
store sales through one time sales. . . . . . . . . . . . . . . . . . . . . . . 161

4.  Deloitte & Touche knew or recklessly disregarded
the fact that Fleming overstated the value of its
inventory and understated cost of merchandise sold. . . . . . . . . 163

5.  Deloitte & Touche knew or recklessly disregarded
the fact that Fleming's assets were impaired. . . . . . . . . . . . . . . 165

6.  D&T failed to perform or disregarded the results
of required procedures concerning "other information"
such as "same-store sales." . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

IX.  Additional Scienter Allegations Against the 1934 Act Individual Defendants . . . . . . . . 176

X.  Applicability of Presumption of Reliance: Fraud-on-the-Market Doctrine . . . . . . . . . . . . 180

XI.  Inapplicability of Statutory Safe Harbor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

COUNT I
    VIOLATION OF SECTION 10(b) OF THE SECURITIES
    EXCHANGE ACT AND RULE 10b-5 THEREUNDER
    AGAINST THE 1934 ACT INDIVIDUAL DEFENDANTS    . . . . . . . . . . . . . . . . . . . 182

COUNT II
    VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
    AND RULE 10b-5 THEREUNDER AGAINST DELOITTE & TOUCHE    . . . . . . . . 184

COUNT III
    VIOLATION OF SECTION 20(a)OF THE SECURITIES
    EXCHANGE ACT AGAINST THE 1934 ACT INDIVIDUAL DEFENDANTS    . . . 188

COUNT IV
    VIOLATIONS OF SECTION 11 OF THE 1933 ACT    . . . . . . . . . . . . . . . . . . . . . . . . 189

COUNT V
    VIOLATIONS OF SECTION 12(A)(2) OF THE 1933 ACT    . . . . . . . . . . . . . . . . . . 195

COUNT VI
    VIOLATIONS OF SECTION 15 OF THE 1933 ACT    . . . . . . . . . . . . . . . . . . . . . . . . 199

JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

This is a securities class action on behalf of all persons who purchased or acquired the publicly traded equity and debt securities of Fleming Companies, Inc. ("Fleming"or the "Company") between May 9, 2001 and February 25, 2003, inclusive (the "Class Period"), including those who purchased or acquired such Fleming securities issued in, pursuant to, or traceable to the March 14, 2002 Registration Statement (the "March 2002 Subclass") or the June 17, 2002 Registration Statement (the "June 2002 Subclass").

## I.  Nature of the Action

1.      Lead Plaintiff Jackson Capital Management, LLC, brings this class action on behalf of all persons who purchased the publicly traded equity and debt securities of Fleming Companies, Inc. ("Fleming" or the "Company") between May 9, 2001 and February 25, 2003, inclusive (the "Class Period") to recover damages caused by defendants' violations of the Securities Exchange Act of 1934 ("1934 Act" or "Exchange Act").[1]

2.      Plaintiffs Massachusetts State Carpenters Pension Fund, Massachusetts State Guaranteed Annuity Fund, Alaska Electrical Pension Fund, Anthony Colarich, David Dickey, Joel Feliciano, Raheela Zaman and Terry Slater bring class action claims for violations of the Securities Act of 1933 ("1933 Act" or "Securities Act") on behalf of all persons who purchased or acquired Fleming securities[2] issued in, pursuant to, or traceable to the June 17, 2002 Registration Statement and Prospectus, as amended (collectively, the "June Registration Statement"), which was used to

---

[1]Defendants subject to the 1934 Act claims asserted herein are Fleming's auditor, Deloitte & Touche LLP ("D&T") and the following individuals: Mark Hansen ("Hansen"), Neal J. Rider ("Rider"), Mark D. Shapiro ("Shapiro"), Thomas Dahlen ("Dahlen"), and E. Stephen Davis ("Davis") (collectively referred to as the "1934 Act Individual Defendants").

[2]Fleming issued $200 million in Notes and 9.2 million shares of common stock priced at $19.40.

raise more than $378 million from investors via the sale of newly issued Fleming securities.[3] Plaintiff Terry Slater also brings class action claims for violations of 1933 Act on behalf of all persons who purchased or acquired 10.625% bonds issued in, pursuant to, or traceable to Fleming's March 14, 2002 Registration Statement and Prospectus, as amended (collectively, the "March Registration Statement").[4]

3.     This case involves a public company's scheme to falsely inflate its publicly traded securities by means of accounting manipulations and false public statements about its business, operations, and profit. The scheme, which was partially revealed to the investing public in news articles published on September 4 and 5, 2002, is so egregious that Fleming has been referred to in the food industry as "Flem-ron." (*Albuquerque Journal*, 11/15/2002).[5]

4.     Fleming operates a wholesale and retail grocery business. In 1998, after several years of poor performance and declining stock values, Fleming appointed a new CEO—Mark Hansen—and announced a "strategic plan" to improve earnings and increase its stock price. The plan targeted both wholesale and retail earnings.

---

[3]Defendants subject to the 1933 Act claims asserted herein are D&T, the underwriters for the June Offering (Lehman Brothers Inc., Deutsche Bank Securities Inc., Wachovia Securities and Morgan Stanley Co.) and the following individuals: Hansen, Rider, Shapiro, Herbert M. Baum ("Baum"), Kenneth M. Duberstien ("Duberstein"), Archie R. Dykes ("Dykes"), Carol B. Hallett ("Hallett"), Robert S. Hamada ("Hamada"), Alice M. Peterson ("Peterson"), and Carlos M. Hernandez ("Hernandez") (collectively referred to as the "1933 Act Individual Defendants").

[4]Defendants subject to the 1933 Act claims asserted by Slater and March 2002 Subclass are D&T and the following individuals: Hansen, Rider, Baum, Duberstein, Dykes, Hallett, Hamada, Peterson, Edward C. Joullian, III ("Joullian"), and Guy A. Osborn ("Osborn").

[5]     As detailed further herein, Plaintiffs expressly disavow any allegations of fraud or scheme relating to the 1933 Act claims. Any fraud or scheme allegations in this Complaint relate only to plaintiffs' 1934 Act claims.

5.      Under the retail component of this strategic plan, Fleming's retail segment exited the "conventional" grocery store business. "Conventional" grocery stores are grocery stores that come with amenities, such as deli counters, bakeries, pharmacies, and other services designed to attract customers. Fleming moved its retail focus to "price impact" or "value retailing" grocery stores. These stores feature few amenities and services and often are constructed out of cinder block with concrete floors. They compete on only one basis—price. Fleming announced aggressive plans to increase its ownership of price-impact stores, and Fleming suggested to the investing public that as a wholesaler, it could reduce supply-chain inefficiencies and therefore lower prices at its own retail stores.

6.      Analysts and the investing public responded favorably to the Fleming strategic plan. For three and a half years after the plan was announced, earnings improved. Fleming's stock price, which had dipped as low as $8 a share in late 1998, rebounded sharply, rising to nearly $40 per share in the summer of 2001, and facilitating Fleming's huge stock and bond offerings via the March and June Registration Statements. Then, on July 30, 2002, less than two weeks after Fleming's June 17, 2002 stock and bond offering which raised over $350 million from unsuspecting investors, and after more than two years of the 1934 Act Individual Defendants' steadily touting the growth potential for price-impact stores, Fleming suddenly announced that it was considering selling all of its retail stores, and that retail earnings had fallen dramatically from 2001 to 2002. This sudden announcement caused Fleming's stock price to plummet 33.5% from $16.18 on July 29, 2002 to $10.76 on August 2, 2002. The prices of Fleming bonds likewise reacted negatively to the adverse announcement.

7.      Fleming's July 30, 2002 disclosures punished its stock price, but revealed only a portion of Fleming's problems. In fact, Fleming's retail segment already was awash in operating

3

losses, and its finances were deteriorating.  Fleming had known since the first half of 2001 that the price impact format was not working.  The format did not increase revenues and earnings.  Instead, the price-impact stores were rejected by customers, at least in part because they did not really offer cost savings.

      8.    Only five weeks after the July 30, 2002 disclosures, investors learned that Fleming's wholesale segment, like the retail segment, was facing serious problems.  On September 4, 2002, an article on *Dow Jones Newswire* revealed that Fleming appeared to be using its retail stores as a dumping ground for excess wholesale inventory, and that Fleming had been using unauthorized vendor deductions to artificially inflate its earnings and revenue and to improve its cash flow.  The next day, an article in the *Wall Street Journal* revealed that Fleming had had over $100 million in disputes with vendors over deductions that Fleming unilaterally took from vendors' invoices.  For example, in August 2001, Fleming had retroactively deducted three percent from amounts owed vendors for the prior twelve weeks, in a program that it called "shared savings," without any agreement from vendors.  Similarly, in the Spring of 2001, Fleming implemented an "off-shore funding equalization" deduction, again not approved by vendors, because, Fleming claimed, vendors had not offered sufficient discounts to Hawaiian and Caribbean stores.

      9.    The effect of Fleming's unauthorized, improper, and unsustainable deductions was to inflate Fleming's earnings.  However, Mark Hansen, Fleming's CEO, and Neal Rider, Fleming's CFO, falsely assured the market that Fleming did not have a significant number of disputed deductions.

      10.    On the same day as the *Wall Street Journal* article – September 5, 2002 – Fleming announced that there was no evidence that retail earnings were going to recover in 2002.  Fleming's stock sunk even lower.  The stock, which had traded at $9.31 on September 3, 2002, fell to $6.51

a share at the close of business on September 9, 2002, a decline of 30%. The prices of Fleming bonds also reacted negatively to the adverse announcement and news article.

11.     Fleming's problems continued over the next several months. In a press release dated November 13, 2002, Fleming announced that the Securities and Exchange Commission had initiated an informal investigation into the Company's accounting practices. In a press release dated January 14, 2003, Fleming announced that it was marking down the "realizable value" of its retail stores by $116 million. This contributed to a year-end retail loss of $190 million. In February 2003, after losing a contract with Kmart, its largest retail customer, defendant Shapiro reassured a worried public that any concern that Fleming might declare bankruptcy was "ludicrous." Within eight weeks, Fleming indeed declared bankruptcy.

12.     On February 25, 2003, Fleming announced that the SEC had upgraded its investigation to formal. The stock dropped from $2.97 to $1.85, or 38%. Fleming's bonds suffered a comparable drop.

13.     For the period of nearly two years preceding February 25, 2003, Fleming's financial statements were consistently false. Fleming's retail president – defendant Thomas Dahlen – and retail CFOs – first, John Simrell, then Tim Otte – with the knowledge and/or reckless disregard of the true facts by the other 1934 Act Individual Defendants, used a variety of techniques to inflate earnings in violation of accepted accounting practices. They accrued unauthorized, improper, and unsustainable deductions from accounts payable due to vendors. Moreover, they manipulated "same store" sales figures used by analysts and investors to judge the improvement or deterioration of a retail business from year to year.

14.     During that same period, Fleming's wholesale president – defendant Stephen Davis – with the knowledge and/or reckless disregard of the true facts by the other 1934 Act Individual

Defendants, also utilized a variety of techniques, including the accrual of unauthorized, improper, and unsustainable deductions from accounts payable due to vendors, to inflate earnings in violation of accepted accounting practices.

15.    Dahlen's, Simrell's, Otte's, and Davis' manipulations were known to or recklessly disregarded by defendant Mark Hansen, the corporate CEO, defendant Neal Rider, the corporate CFO, and defendant Mark Shapiro, the corporation's Chief Accounting Officer who later replaced Rider as CFO. These manipulations alone allowed Fleming to present a materially false and misleading picture of its business to the market. However, these manipulations were not alone. They were compounded by Hansen's and Rider's false public statements about, among other things, the health of the retail segment and the viability of the price-impact format, a store format which offered few amenities and services and competed on only one basis – price.

16.    Fleming and the 1934 Act Individual Defendants would not have been able to conceal and misrepresent Fleming's true adverse conditions without the involvement of Fleming's auditor, Deloitte & Touche ("D&T"). D&T's unqualified or "clean" audit opinion was included in Fleming's 2001 Form 10-K and incorporated in the March and June Registration Statements. The Underwriters of the June 2002 Offering also profited greatly from their involvement with the Company, and their involvement was key to facilitating the June 2002 offering, which propped up the Company with a cash infusion of over $350 million in new money at the expense of the investors who bought on that offering.

17.    The prices of Fleming's publicly traded securities were artificially inflated during the Class Period by the false and misleading financial statements and other statements as will be set forth in detail herein. The stock price, which traded between $20 and $35 a share for most of the Class Period, fell to approximately $6 a share after the revelations on September 4 and 5, 2002, fell

to less than $2 a share after the February 25, 2003 announcement, and now sells at less than $0.05 per share. Fleming's bonds are now almost worthless.[6]

## II.  Jurisdiction and Venue

18.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the 1934 Act, 15 U.S.C. §78aa, §22 of the 1933 Act, 15 U.S.C. §77v, and 28 U.S.C. §1331. The claims asserted herein arise under Sections 10(b) and 20(a) of the 1934 Act, as amended, 15 U.S.C. §78j(b) and 15 U.S.C. §78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC, and under §§11 and 12(a)(2) of the 1933 Act, 15 U.S.C. §§77k and 77l(a)(2).

19.    Venue is proper in this District pursuant to § 27 of the 1934 Act, §22 of the 1933 Act, and 28 U.S.C. §1391(b). Fleming maintains its principal executive offices within this District and many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this District. In addition, venue is proper because the MDL Panel has transferred these cases to this District.

20.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, the defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications, and the facilities of a national securities exchange.

## III.  The Parties

### A.    Lead Plaintiff

21.    Lead Plaintiff Jackson Capital Management, LLC purchased the common stock of Fleming during the Class Period at artificially inflated prices and was damaged thereby.

---

[6]The 1933 Act Plaintiffs, with respect to the 1933 Act causes of action and the paragraphs of this Complaint incorporated therein, expressly disavow any allegations of fraud.

**B.   1933 Act Plaintiffs**

22.    Plaintiffs Massachusetts State Carpenters Pension Fund, Massachusetts State Guaranteed Annuity Fund, Alaska Electrical Pension Fund, Anthony Colarich, David Dickey, Joel Feliciano, Raheela Zaman and Terry Slater purchased or acquired Fleming stock and bond securities that were issued in, pursuant to, or traceable to Fleming's June 2002 Registration Statement and Prospectus and suffered damages thereby.

22.A.   The 1933 Act plaintiffs purchased Fleming securities in the June offering directly from the underwriting syndicate consisting of Underwriter Defendants (defined herein) Lehman Brothers Inc., Deutsche Bank Securities Inc., Wachovia Securities, and Morgan Stanley Co. As a result, title to the subject securities was transferred to plaintiffs by and directly from Underwriter Defendants.  On June 13, 2002, plaintiff Alaska Electrical Pension Fund purchased $26,000 of 9.25% bonds from defendant Deutsche Bank Securities Inc., and title to these securities was transferred directly from Deutsche Bank Securities Inc. to plaintiff in the June Offering and pursuant to the June 2002 Registration Statement. On June 12, 2002, plaintiff Massachusetts State Carpenters Pension Fund purchased 10,200 shares of Fleming common stock at the offering price of $19.40 per share from Deutsche Bank Securities Inc., and title to these securities was transferred directly from Deutsche Bank Securities Inc. to plaintiff in the June Offering and pursuant to the June 2002 Registration Statement.  On June 12, 2002, plaintiff Massachusetts Guaranteed Annuity Fund purchased 6,000 shares of Fleming common stock at the offering price of $19.40 per share from Deutsche Bank Securities, Inc., and title to these securities was transferred directly from Deutsche Bank Securities Inc. to plaintiff in the June Offering and pursuant to the June 2002 Registration Statement. On June 12, 2002, plaintiff David Dickey purchased 2000 shares of Fleming common

stock at the offering price of $19.40 per share from Morgan Stanley Dean Witter & Co., and title to these securities was transferred directly from Morgan Stanley to plaintiff in the June Offering and pursuant to the June 2002 Registration Statement.  On June 12, 2002, plaintiff Raheela Zaman purchased 1000 shares of Fleming common stock at the offering price of $19.40 per share from Wachovia Securities, and title to these securities was transferred directly from Wachovia Securities to plaintiff in the June Offering and pursuant to the June 2002 Registration Statement.  On June 12, 2002, plaintiff Terry Slater purchased 50 shares of Fleming common stock at the offering price of $19.40 per share from Morgan Stanley Dean Witter & Co., and title to these securities was transferred directly from Morgan Stanley to plaintiff in the June Offering and pursuant to the June 2002 Registration Statement.  On June 12, 2002, plaintiff Joel Feliciano purchased 100 shares of Fleming common stock at the offering price of $19.40 per share from Morgan Stanley Dean Witter & Co., and title to these securities was transferred directly from Morgan Stanley to plaintiff in the June Offering and pursuant to the June 2002 Registration Statement.  Because plaintiffs purchased these securities directly from an underwriter of the June Offering and in connection with their distribution of securities pursuant to the June Offering, plaintiffs paid no commission on these purchases of securities.

23.    Plaintiff Terry Slater also acquired Fleming bonds which were issued in, pursuant to, or traceable to the March 2002 Registration Statement and Prospectus, and suffered damages thereby.

C.    **Non-Party Fleming**

24.    Non-party Fleming is an Oklahoma corporation with its principal executive offices located within this District at 1945 Lakepointe Drive, Lewisville, Texas 75029.  At all relevant times, Fleming's common stock actively traded on the New York Stock Exchange under the symbol "FLM."  As of June 13, 2002, 53,805,000 shares of Fleming common stock were outstanding.  Due

to its bankruptcy, Fleming is not a party.  However, Plaintiffs reserve the right to name Fleming as a defendant at a later date.

**D.     1934 Act Individual Defendants**

25.     Defendant Mark Hansen ("Hansen") served as Fleming's Chief Executive Officer and the Chairman of the Board of Directors from November 1998 until he resigned on March 3, 2003.  Hansen signed the Company's 2001 10-K, as well as the March Registration Statement containing the false statements detailed herein pursuant to which the March 2002 Offering was consummated and the relevant securities were sold, and the June Registration Statement containing the false statements detailed herein pursuant to which the June 2002 Offering was consummated and the relevant securities were sold.

26.     Defendant Neal J. Rider ("Rider") was Fleming's Chief Financial Officer from January 2000 to February 2003, when he was appointed to the position of Executive Vice President, Business and Operations Development.  Rider signed several of the false and misleading financial statements described herein, as well as the March Registration Statement containing the false statements detailed herein pursuant to which the March 2002 Offering was consummated and the relevant securities were sold, and the June Registration Statement containing the false statements detailed herein pursuant to which the June 2002 Offering was consummated and the relevant securities were sold.

27.     Defendant Mark D. Shapiro ("Shapiro") was Fleming's Senior Vice President of Finance and Control and Chief Accounting Officer from at least 2001 to February 2003, at which time he was appointed Chief Financial Officer.  Shapiro left Fleming in late-April 2003.  At the time, Fleming's spokesman would not say whether Shapiro resigned or was fired.  Shapiro signed many of the false and misleading financial statements described herein, as well as the June

Registration Statement containing the false statements detailed herein pursuant to which the June 2002 Offering was consummated and the Fleming Securities were sold.

28.     Defendant Thomas Dahlen ("Dahlen") became Fleming's Executive Vice President and President, Retail and Marketing in April 2001. Fleming's 10-Q dated November 6, 2002 stated that Dahlen resigned effective December 31, 2002.

29.     Defendant E. Stephen Davis ("Davis") became Fleming's Executive Vice President and President, Wholesale in 2000. On February 26, 2003, Fleming announced that Davis would be retiring from the Company in May 2003.

30.     Defendants Hansen, Rider, Shapiro, Dahlen, and Davis are collectively referred to herein as the "1934 Act Individual Defendants."

31.     As described below in more detail, each of the 1934 Act Individual Defendants regularly received reports showing adverse and undisclosed information about the financial results and performance of the Company. Each of the 1934 Act Individual Defendants directly participated in the management of Fleming, was directly involved in the operations of Fleming at the highest levels, knew information concerning the financial results and performance of the Company, and was involved in the dissemination of the materially false and misleading statements and information alleged herein.

32.     By reason of their positions as executive officers and directors of Fleming, each of the 1934 Act Individual Defendants was at all relevant times a controlling person within the meaning of Section 20 of the 1934 Act. Because of their executive and directorial positions at Fleming, each of the 1934 Act Individual Defendants received adverse, non-public, and specific information about the Company's true financial results and performance. Furthermore, as particularized herein, each of the 1934 Act Individual Defendants was able to and did control the contents of various reports and public statements regarding Fleming and its financial results and

11

performance. Any acts attributed to Fleming were caused and/or influenced by the 1934 Act Individual Defendants by virtue of their controlling-person positions at the Company.

33.    As the senior officers and directors of a publicly-held company whose securities were, at all relevant times, registered with the SEC pursuant to the 1934 Act, traded on the New York Stock Exchange, and governed by the provisions of the federal securities laws, the 1934 Act Individual Defendants had a duty to promptly disseminate accurate and truthful information about Fleming's financial results and performance, so that the market price of Fleming's publicly-traded securities would be based upon truthful and accurate information. The 1934 Act Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations. Accordingly, the 1934 Act Individual Defendants were responsible for the accuracy of the public statements and releases detailed herein and are primarily liable for the misrepresentations contained therein.

**E.    1933 Act Individual Defendants.**

34.    Defendant Herbert M. Baum ("Baum") was, at all relevant times hereto, a director of Fleming. Baum signed the March Registration Statement containing the false statements detailed herein pursuant to which the March 2002 Offering was consummated and the relevant securities were sold, and the June Registration Statement containing the false statements detailed herein pursuant to which the June 2002 Offering was consummated and the relevant securities were sold.

35.    Defendant Kenneth M. Duberstein ("Duberstein") was, at all relevant times hereto, a director of Fleming. Duberstein signed the March Registration Statement containing the false statements detailed herein pursuant to which the March 2002 Offering was consummated and the relevant securities were sold, and the June Registration Statement containing the false statements

detailed herein pursuant to which the June 2002 Offering was consummated and the relevant securities were sold.

36.     Defendant Archie R. Dykes ("Dykes") was, at all relevant times hereto, a director of Fleming. Dykes signed the March Registration Statement containing the false statements detailed herein pursuant to which the March 2002 Offering was consummated and the relevant securities were sold, and the June Registration Statement containing the false statements detailed herein pursuant to which the June 2002 Offering was consummated and the relevant securities were sold.

37.     Defendant Carol B. Hallett ("Hallett") was, at all relevant times hereto, a director of Fleming. Hallett signed the March Registration Statement containing the false statements detailed herein pursuant to which the March 2002 Offering was consummated and the relevant securities were sold, and the June Registration Statement containing the false statements detailed herein pursuant to which the June 2002 Offering was consummated and the relevant securities were sold.

38.     Defendant Robert S. Hamada ("Hamada") was, at all relevant times hereto, a director of Fleming. Hamada signed the March Registration Statement containing the false statements detailed herein pursuant to which the March 2002 Offering was consummated and the relevant securities were sold, and the June Registration Statement containing the false statements detailed herein pursuant to which the June 2002 Offering was consummated and the relevant securities were sold.

39.     Defendant Alice M. Peterson ("Peterson") was, at all relevant times hereto, a director of Fleming. Peterson signed the March Registration Statement containing the false statements detailed herein pursuant to which the March 2002 Offering was consummated and the relevant securities were sold, and the June Registration Statement containing the false statements detailed

13

herein pursuant to which the June 2002 Offering was consummated and the relevant securities were sold.

40.     Defendant Carlos M. Hernandez ("Hernandez") was, at all relevant times hereto, Senior Vice President and General Counsel of Fleming. Hernandez signed the March Registration Statement containing the false statements detailed herein pursuant to which the March 2002 Offering was consummated and the relevant securities were sold, and the June Registration Statement containing the false statements detailed herein pursuant to which the June 2002 Offering was consummated and the relevant securities were sold.

41.     Defendant Edward C. Joullian, III ("Joullian") was, at all relevant times hereto, a director of Fleming.  Joullian signed the March Registration Statement containing the false statements detailed herein pursuant to which the March 2002 Offering was consummated and the relevant securities were sold.

42.     Defendant Guy A. Osborn ("Osborn") was, at all relevant times hereto, a director of Fleming. Peterson signed the March Registration Statement containing the false statements detailed herein pursuant to which the March 2002 Offering was consummated and the relevant securities were sold.

43.     Defendants Hansen, Rider, Dahlen, Shapiro, Baum, Duberstein, Dykes, Hallett, Hamada, Peterson, Hernandez, Joullian, and Osborn are collectively referred to as the "1933 Act Individual Defendants."

## F.     Defendant Deloitte & Touche

44.     Defendant Deloitte & Touche LLP ("D&T") is a worldwide firm of certified public accountants, auditors and consultants that provides a variety of accounting, auditing, and consulting services. D&T, through its Dallas, Texas office, served as Fleming's auditor and principal

14

accounting firm commencing prior to the Class Period herein and continuing at all relevant times. D&T acted in these capacities pursuant to the terms of contracts it had with Fleming that, among other things, required D&T to audit Fleming's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS"), and to report the results of those audits and quarterly reviews to Fleming, its board of directors, its audit committee, and the members of the investing public, including plaintiffs and the members of the Class.

45.    The Dallas office of D&T was engaged by Fleming to provide independent accounting, business consulting and auditing services to Fleming and gave Fleming accounting advice and consultation regarding Fleming's annual and quarterly reports which were filed with the SEC and publicly distributed. Defendant D&T, by virtue of its position as independent accountant and auditor of Fleming, had access to the files and key employees of the Company at all relevant times. As a result of the auditing and other services it provided to Fleming, D&T personnel were frequently present at Fleming's corporate headquarters throughout each year, and had continual access to and knowledge of Fleming's confidential internal corporate, financial, operating, and business information, and had the opportunity to observe and review the Company's business and accounting practices, and to test the Company's internal and publicly reported financial statements as well as the Company's internal controls and structures.

46.    With knowledge of Fleming's true financial condition, as alleged below, or in reckless disregard thereof, D&T certified that the false and misleading financial statements of Fleming as of and for the fiscal year ended December 29, 2001 (the "2001 Financial Statements") described below had been conducted in accordance with GAAS and provided an unqualified Independent Auditors' Report (dated February 13, 2002) on those financial statements, which falsely certified that the 2001 Financial Statements fairly presented Fleming's financial condition and

15

results of operations in conformity with GAAP, and which was included in various of the Company's SEC filings and public disseminations. Without this false unqualified audit opinion and report, the scheme alleged below could not have been perpetrated. D&T consented to the incorporation by reference of the false and misleading 2001 certified financial statements into the June Registration Statement used in connection with the June 2002 Offering. Fleming's 2001 financial statements were false, as detailed below. D&T directly participated in and worked with Fleming to develop the accounting practices and disclosures for the Company's expenses and income utilized in the fiscal year 2001 audited financial statements and for the financial results for the quarter ended April 20, 2002 included in the Registration Statement. D&T rendered material misleading opinions concerning Fleming's fiscal year 2001 financial statements included in the June Registration Statement for the June 2002 Offering.

47.     Issuance of this false opinion and report violated D&T's contractual and other legal obligations to Fleming and Fleming's investors. The opinion and report contained materially false and misleading statements in violation of the federal securities laws.

48.     D&T also issued materially false and misleading review reports of Fleming's quarterly financial statements throughout 2001 and 2002, in violation of the federal securities laws.

49.     As a result of D&T's knowing or reckless misconduct and participation in Fleming's fraudulent scheme, D&T is jointly and severally liable to plaintiffs and the other members of the Class.

G.     **Underwriter Defendants**

50.     Defendants Lehman Brothers Inc., Deutsche Bank Securities Inc., Wachovia Securities (including First Union Securities, Inc. and Wachovia Corporation) and Morgan Stanley Co. Incorporated (collectively, the "Underwriter Defendants") are investment banking firms which

16

specialize, *inter alia*, in underwriting public offerings of securities and making markets in the stock of public companies. These firms each served as co-lead underwriters of the June 2002 Offering. Each of these firms participated in the preparation and issuance of the false and misleading June Registration Statement used by them in underwriting the June 2002 Offering. In connection with the June 2002 Offering, the Underwriter Defendants had access to Fleming and its top executives and thus had access to Fleming's internal corporate information, including the adverse information omitted and/or misrepresented, as alleged herein.

51.     The Underwriter Defendants, directly through their agents and representatives, assisted Fleming and the 1933 Act Individual Defendants in planning the Offering, and supposedly conducted an adequate and reasonable investigation into the business and operations of Fleming, an undertaking known as a "due diligence" investigation. In connection with the Offering, these defendants had access to internal Fleming documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto) and conversations with corporate officers and employees. These defendants failed to conduct a reasonable investigation to ensure that the statements made by them were not misleading and that they did not omit any material fact required to be stated in order to make the statements made not misleading.

52.     A due diligence investigation was required of the Underwriter Defendants in order to engage in the June 2002 Offering. In the course of the investigation, the Underwriter Defendants directly, and indirectly via their counsel, met with the 1933 Act Individual Defendants and other representatives, employees, and/or agents of Fleming during May and June 2002, and reached an understanding as to: (i) the strategy to best accomplish the June 2002 Offering; (ii) the terms of the June 2002 Offering; (iii) the language to be used in the June Registration Statement; and (iv) what disclosures about the Company's cost structures, the purported economies of scale in dealing with

17

vendors and suppliers, the problems with unauthorized discounts from vendor invoices, and the adverse conditions surrounding retail operations would be made in the June Registration Statement. Each of the Underwriter Defendants caused the Prospectus and other written and/or oral statements to be delivered to potential and actual purchasers of Fleming Securities in connection with offers to sell and sales thereof. As a result of their "due diligence" investigation of Fleming, purportedly undertaken in connection with the June 2002 Offering, the Underwriter Defendants knew or should have known that the June Registration Statement and the oral and written statements made by them in connection with the June 2002 Offering were false and misleading as a result of the omissions and/or misstatements alleged herein.

53.     The Underwriter Defendants also had knowledge of and/or access to the true facts regarding Fleming because the Underwriter Defendants had been providing investment banking, commercial lending, and financial advisory services to Fleming in the ordinary course of business before the June 2002 Offering. In connection with providing these financial services to Fleming, the Underwriter Defendants have had conversations with corporate officers and employees, attended meetings, and had access to the Company's internal accounts, records, and operating plans and results of actual operations compared thereto, which provided them access to the true condition of Fleming's retail operations and its improper accounting practices.

54.     The Underwriter Defendants, D&T, and the 1933 Act Individual Defendants are all liable for making misleading statements and failing to disclose material adverse facts which artificially inflated the price of Fleming securities issued to class members in the June 2002 Offering and caused class members to purchase Fleming securities in the June 2002 Offering at inflated prices.

55.     The Underwriter Defendants, D&T, and the 1933 Act Individual Defendants were obligated to make a reasonable and diligent investigation of the written and oral statements made in the Registration Statement, selling sheets, and roadshow presentations, to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Each of these defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the June 2002 Offering materials as set forth herein.

### IV.  Class Action Allegations

56.     Lead Plaintiff brings this case as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and all other persons who purchased or otherwise acquired Fleming publicly traded equity and debt securities between May 9, 2001 and February 25, 2003, inclusive (the "Class"), including those who purchased or acquired Fleming securities issued in, pursuant to, or traceable to the March 14, 2002 Registration Statement (the "March 2002 Subclass") and the June 17, 2002 Registration Statement (the "June 2002 Subclass"). The class includes persons or entities who purchased or otherwise acquired Fleming common stock and Fleming bonds that traded during the Class Period, including but not limited to:

- 10 1/2% senior subordinated notes (2004) called in June 2002

- 8.74% Series B medium term notes matured on September 19, 2002

- 9.28% Series A medium term notes matured on March 3, 2003

- 8.81% Series B medium term notes maturing on August 26, 2003

- 10 5/8% senior subordinated notes maturing on July 31, 2007

- 10 1/8% senior notes maturing on April 1, 2008

- 5 1/4% convertible senior subordinated notes maturing on March 15, 2009

19

- 9 1/4% senior notes maturing on June 15, 2010

57.   Excluded from the Class are Fleming, its subsidiaries and affiliates, the defendants, members of the immediate families of each of the defendants, any entities in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors, affiliates or assigns of any of the foregoing excluded persons and entities.

58.   This action is properly maintainable as a class action because:

a.   The members of the Class and Subclasses are so numerous that joinder of all members is impracticable.  Until it was delisted in April 2003, Fleming common stock was actively traded on the New York Stock Exchange. During the Class Period, in excess of 25 million shares of Fleming common stock were outstanding, and tens of millions of shares were publicly traded. Upon information and belief, plaintiff believes that there are more than 1,000 members of the class;

b.   Lead Plaintiff's and the 1933 Act Plaintiffs' claims are typical of the claims of the other members of the Class, as they and the members of the Class purchased Fleming securities and sustained damages as a result of defendants' wrongful conduct complained of herein;

c.   Lead Plaintiff and the 1933 Act Plaintiffs are representative parties who will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action securities litigation.  Lead Plaintiff and the 1933 Act Plaintiffs have no interests antagonistic to, or in conflict with, the Class they seek to represent;

d.   A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein.  As the damages suffered by the individual Class and Subclass members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class and Subclass members individually to redress the wrongs done to them. The likelihood of individual Class and Subclass members prosecuting separate claims is remote;

e.   There are common questions of law or fact common to the members of the Class and Subclasses which predominate over any questions affecting individual members of the Class and Subclasses. The questions of law or fact which are common to Lead Plaintiff and the Class and Subclasses include, among others:

20

1.    whether the federal securities laws were violated by defendants' acts as alleged herein;

2.    whether statements disseminated to the investing public and to purchasers and owners of Fleming's publicly traded securities during the Class Period misrepresented material facts about the financial results and performance of the Company;

3.    whether D&T's audit and review reports on Fleming's Class Period financial statements were materially false and misleading as alleged herein;

4.    with respect to the 1934 Act claims, whether defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting to state material facts;

5.    whether, during the Class Period, the market prices of Fleming's publicly traded securities were artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

6.    with respect to the 1934 Act claims, whether the defendants participated in and pursued the common course of conduct complained of herein; and

7.    whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

f.    Lead Plaintiff and the 1933 Act Plaintiffs anticipate no unusual difficulties in the management of this action as a class action.

## V.  Factual Background

### A.    Fleming struggles in the 1990s.

59.    Fleming is a wholesale distributor of groceries.  In other words, Fleming buys groceries from vendors and sells them to grocery stores.  Until its recent bankruptcy, Fleming also operated its own retail grocery stores.

60.    Fleming struggled in the 1990s. A March 8, 1999 article in *Supermarket News* said that starting in the mid-1990s, "Fleming's image took a pounding that's virtually without precedent in the annals of food distribution." Over that time, Fleming was hit by numerous lawsuits involving

overcharging customers, leaving a "persistent negative image." In addition to the lawsuits, Fleming experienced declining revenues. Earnings declined 25 percent in 1995, 36 percent in 1996 and 4.8 percent in 1997. In 1998, earnings plummeted to a loss of $510.6 million, or $13.48 a share.

61.    Fleming's problems led to the termination of CEO Robert Stauth in July 1998. Following that termination, Fleming's stock, which in the late 1980s and early 1990s had consistently traded between $30 and $40 a share, dropped as low as $8 a share.

62.    On November 30, 1998, Fleming announced the appointment of Mark Hansen as CEO and Chairman of the Board.

**B.    Fleming announces a "Strategic Plan."**

63.    One week after Hansen was appointed, Fleming announced a "Strategic Plan to Improve Performance":

> Fleming ... announced today the company is fundamentally shifting its business to focus on core strategic assets in its wholesale and retail operations.
>
> This comprehensive plan is designed to improve the competitiveness of the retailers Fleming serves and the company's performance by building stronger operations that can better support long-term growth.

64.    Fleming's strategic plan had four elements:

- "Wholesale Consolidations to Improve Efficiency." Fleming planned to reduce the number of supply centers for its wholesale customers.

- "Strategic Wholesale Growth Plans." Fleming planned to increase wholesale earnings by, among other things, targeting new markets such as convenience stores.

- "More Focused Retail Operations." Fleming would concentrate on developing its top-performing retail chains and divest the chains that were not performing as well.

- "Reducing Overhead Expenses." Fleming instituted a "low cost pursuit program," which involved reductions in workforce, centralizing administrative functions, and other cost-saving measures.

65.     Fleming outlined in its press release the financial objectives of the strategic plan:

- earn a return on capital which exceeds the cost of capital,

- produce net earnings which approach 1% of net sales, and

- achieve more than $3.00 in earnings per share by the year 2003.

66.     The strategic plan involved a focus on Fleming's retail operations. *Supermarket News* reported on May 24, 1999 that Hansen told shareholders at an annual meeting that Fleming "will make a stronger and more focused push on retailing than ever before." Part of this push, Hansen said, involved "concentrating on chains with a high market share and good future growth potential," including "price impact" stores.

67.     "Price impact" or "value retail" and related "limited assortment" stores are touted as offering lower prices to consumers than conventional grocery stores. In its 2000 10-K, filed with the SEC on March 23, 2001, Fleming described the difference between price-impact and conventional grocery stores and the growth opportunities for price-impact stores that Fleming portrayed to the market:

> Our price impact supermarkets offer name-brand food and consumable goods at significantly lower prices than conventional format retail store operators because of the many low-cost features of our stores. These features include: offering a reduced number of product selections, focusing on popular, name-brand products and product categories; employing flow-through distribution methods which reduce product storage and handling expense; and minimizing store operating costs by presenting a warehouse-style operation.
>
> These stores do not cost as much as conventional stores to construct and maintain, as price impact stores typically feature cement floors, cinder block walls, exposed ceilings and walk-in freezers and coolers which combine the typically separate storage and display areas. In addition, price impact stores produce lower operating expenses, primarily as a result of less labor content due to pallet or case-loading display racks, fewer product categories offered due to focusing on the more popular items, self bagging, and elimination of on-site service departments such as a bakery or butcher shop.

C.    **Fleming touts its strategic plan to the market.**

68.    Throughout 1999, 2000, and 2001, Fleming touted its strategic plan to analysts and investors. Fleming claimed that the plan would increase earnings, and pointed to its improving financial results as evidence of the plan's success. Fleming portrayed the conversion to price-impact stores as an important part of the strategic plan, and aggressively pursued a strategy of acquiring and opening price-impact stores and either selling conventional stores or converting them to the price-impact format.

69.    In a press release dated January 20, 2000, Fleming attributed a growth in revenues in part to its emphasis on Food4Less price-impact stores, and stated an expectation of future retail growth, especially on a "same store" basis:

> "This is the first time in over four years that our quarterly sales have increased over the prior year. The increase was driven by new wholesale business, sales in the 8 Food4Less retail stores the company acquired earlier in 1999, and 21 stores added in the company's other chains during the year. While our retail food segment experienced a 1.4% decrease in same-store sales in the 1999 fourth quarter, this represents a significant improvement over the 4.3% decrease in same-store sales experienced in the 1999 third quarter."

*    *    *

> In addition, the company expects its retail food segment to begin experiencing positive same store sales growth by mid-2000 compared to 1999 due to actions taken to improve store-level marketing efforts. Hansen said: "We also expect to see improved operating earnings in our retail food segment based on changes Denny Lucas, our new Executive Vice President and President of Retail, and his team have made, the benefits of the wholesale cost reductions for our conventional retail stores, and the growing profitability of our value-oriented, price impact retail stores."

70.    Early in 2000, Fleming made clear that its focus on price-impact stores would mean the divestment of conventional stores. In a press release dated April 25, 2000, Fleming announced that it had engaged Morgan Stanley Dean Witter "to assist in exploring strategic alternatives for

24

Fleming's conventional supermarket chains, including the potential sale of these operations." In the press release, Fleming and defendant Hansen portrayed price-impact stores as a growth area, distinct from the stagnant economics of conventional stores:

> The company intends to focus greater management and financial resources on Fleming's growth areas, including value retailing.

> "The conventional supermarket segment offers local-market growth potential for independents and national growth potential for consolidators, and these are strong operations," said Fleming CEO and Chairman Mark Hansen. "But the middle ground potential does not meet our aggressive targets for shareholder value, and the company-owned conventional supermarket format does not fit our growth strategy."

> "We are focusing our financial and management resources on Fleming's very best growth prospects and continued improvement of our cost structure. This allows Fleming to strengthen its value proposition and service to the independent retailers, chain retailers, e-tailers and other customers of our distribution segment. It also enhances our opportunities to accelerate our growth commitment to value retailing, including our Food4Less warehouse concept."

> "The value retail format is distinct and consumers have demonstrated a demand for deep price impact operation. We believe Fleming's distribution system is well suited to serve this format. Fleming can become a major player in a very short time, providing our shareholders with superior returns and growing our company to exciting levels in this retail area," said Hansen.

71.    Hansen portrayed the price-impact format as a model that presented an opportunity for explosive sales growth and dramatic expense reductions. The *Milwaukee Journal Sentinel* reported on April 26, 2000 that "Hansen told industry analysts earlier this year that the typical Food 4 Less store costs up to 25% less to build than a conventional supermarket. The Food 4 Less segment's sales are expected to grow by about 30% in 2000, compared to expected sales growth of just 5% for Fleming's conventional supermarkets."

72.    On May 8, 2000, *Supermarket News* reported that Fleming planned to open up to 100 Food4Less price-impact grocery stores over the next two years. The article quoted Hansen: "We

see substantial nationwide growth potential for the warehouse format, with up to 25% of consumers in many markets saying they want a price-impact store."

73.    Fleming and Hansen told shareholders that the conversion to price-impact stores would enhance shareholder returns. For example, in an article dated May 8, 2000, *DSN Supercenter & Club Business* reported that "Fleming, said Hansen, is focusing on the company's 'very best growth prospects.' Hansen feels a bigger move into value retailing will permit Fleming to become a major player in a very short time, offering enhanced shareholder returns."

74.    By May 2000, Fleming had begun the process of selling a large number of conventional stores. *The Food Institute Report* reported on May 15, 2000 the complete shift of Fleming to "value retailing": "The decision by Fleming to concentrate exclusively on a single value-oriented retail format came on the heels of the distributor's decision to sell 161 conventional stores operated by five corporate owned-chains."

75.    Fleming's shift to the price-impact format came in the context of Fleming's broader implementation of its strategic plan. Fleming credited positive financial results to the strategic plan. For example, Fleming's July 26, 2000 press release states:

> The distribution [i.e. wholesale] sales growth, the highest gain since second quarter 1995, resulted from strong new customer growth. "This is high quality and sustainable growth," said Hansen. "The tremendous turnaround in our distribution sales growth and the improvement in both retail and distribution operating performance reaffirms the power of our strategic growth strategies."
>
> Implementation of the strategic plan continues to lower distribution operating costs and improve retail expense controls and margins generated from the Low Cost Pursuit program; increase efficiency and productivity as a result of the distribution center consolidations; and decrease cost of goods resulting from the centralized procurement of products.

76.    Fleming's conversion to price-impact stores was widely reported in 2000. A July 31, 2000 article in *Supermarket News* stated that "one of the most dramatic moves undertaken by

Hansen during his brief tenure" was "the decision to sell most of Fleming's conventional supermarket assets, and to roll out hundreds of Food 4 Less price-impact warehouse stores." The article quoted Hansen touting Food4Less stores: "Food 4 Less is a price-impact, food-warehouse shopping experience. It's not a grocery store, not a supermarket. It's a highly differentiated format. We like Food 4 Less for a lot of reasons: It's a high-volume store; it can be franchised extremely well; in fact, half the [26] Food 4 Less stores in our system are franchised. It's a highly differentiated store, which draws from a large trade area by focusing on consumers who look at price as being the most important aspect of shopping."

77.     Fleming told the public that it intended to aggressively expand its price-impact stores as a long-term strategy.  For example, in the July 31, 2000 *Supermarket News* article, Fleming's executive in charge of Food4Less development, Dennis C. Lucas, made strong claims about Fleming's future retail plans:

> Lucas asserted that Food 4 Less "is a very exciting proposition, which represents an exciting future."
>
> "We're literally restructuring our past focus on conventional retail.  We think the future is in price-impact retail.  So we're moving to that.  We're going to take our small group of 26 stores we have currently and will build that to **a chain of in excess of 500 stores in about 10 years**.
>
> "We've put the business model together and we're in process of starting the rollout.  We're concentrating on leveraging the core competency we have of good case pick, good piece pick and delivering the goods.  This gets back to our strength with the center of the store."

78.     On October 2, 2000, *The Food Institute Report* reported that Fleming announced it had decided to sell or close all but 50 of its conventional stores.

79.     On October 18, 2000, Fleming announced its third quarter 2000 earnings in a press release titled "7.7 Percent Increase in Distribution Sales; Repositioning Retail Operations into

Growth Formats." In the press release, Fleming attributed its claimed third-quarter success in part to its value retail business: "'We are pleased with our performance in the third quarter and credit our differentiated strategic plan which builds competitive distribution advantage and grows our value retail business,' said Mark Hansen, chairman and CEO of Fleming." Fleming continued to tout its strategic plan:

> The company continues to improve operating margins with the ongoing implementation of its strategic plan including cost-reduction initiatives. "We have exceeded our previous earnings guidance and, given the tight market conditions, that's quite an accomplishment," said Hansen.

Finally, in the press release, Fleming announced the conclusion of its review of alternatives for conventional stores:

> The review of strategic alternatives for the conventional retail business was substantially completed in the third quarter with the decision to reposition certain retail operations into the Food 4 Less type value retail format. The Rainbow Foods division has shown significant improvements in sales and earnings. Consequently, 38 of these stores will be retained with two converted to the value retail format and three closed. Fleming is in discussions to sell 53 ABCO stores to other retailers and three will be converted to the value retail format. Ten Sentry stores will be converted to the value retail format and steps are being taken to sell the remaining 24 to existing and new distribution customers. The company is continuing to explore alternatives for the 16 Baker's Supermarkets.

80. Within two months of the October 18, 2000 press release, Fleming announced the sale of its 16 remaining conventional Baker's Supermarkets. Fleming later would begin classifying all of its Rainbow Foods stores as price-impact stores.

81. In a press release dated December 14, 2000, Fleming characterized its sale of the 16 conventional Baker's Supermarkets "as part of Fleming's previously announced strategic plan that focuses on its growth areas. 'We are pleased that the execution of our strategic plan is progressing,' said Mark Hansen. 'This transaction underscores our belief that the conventional supermarket segment offers local-market growth potential for independents and national growth potential for

28

consolidators. We continue to focus our financial and management resources on growing value

retailing and improving distribution operations.'"

82.    On February 14, 2001, Fleming reported a 36% increase in fourth quarter net

earnings. The press release quoted Hansen: "We are very pleased with our fourth quarter results

because they validate our strategic initiatives. . . . Our focus on the distribution and price impact

retail business, paired with the benefits of our central procurement and low-cost pursuit initiatives,

are proving to be the key drivers of Fleming's earnings momentum." The release emphasized

Fleming's "accelerating" foray into price-impact retail operations:

> Fleming is accelerating the growth of its price impact operations. Up to 25
> price impact stores will be opened in 2001. Up to 100 price impact stores will be
> opened over the coming three years. The new price impact store openings will result
> from a combination of new building, conversions of existing retail stores, and
> acquisitions.

83.    In a May 7, 2001 press release, Fleming stated that it had sold all of its conventional

stores by the end of the second quarter 2001. In press releases dated May 9, 2001 and August 1,

2001, Hansen stated that Fleming now had a "laser-like focus on price-impact retail."

84.    Fleming's 2000 10-K, which was filed with the SEC on March 23, 2001, promoted

the price-impact strategy:

> We believe price-sensitive consumers are underserved on a nationwide basis. We
> believe we have a substantial opportunity to grow our retail segment's price impact
> supermarket operations. Our national distribution presence can adequately support
> the continued growth of our price impact retail operations. Because price impact
> stores cost less to build and maintain than conventional supermarkets, we expect to
> be able to grow our price impact supermarket operations while incurring fewer
> capital expenditures. The success of our price impact stores is based on an
> underserved trade area and does not require significant market share. Consequently,
> we believe the typical advertising and marketing expenditure requirements do not
> apply.

**D.**    **Analysts and investors viewed Fleming's retail price-impact plan as important to Fleming's overall performance.**

85.    According to Fleming's 2000 10-K, Fleming's retail business accounted for 22.7% of Fleming's net sales and 38.3% of Fleming's operating earnings. Although the retail segment had smaller net sales and operating earnings than the wholesale segment, stock analysts and the investing public viewed the "price impact" plan as important to Fleming's growth and stock valuation, based on Fleming's statements that price-impact stores were a "key driver[] of Fleming's earnings momentum," and offered "substantial nationwide growth potential," "very superior economics," and "superior returns" for shareholders.

86.    Analysts believed that Fleming's strategic plan, including the conversion to price impact operations, presented an opportunity for growth justifying a higher stock price. In a report dated January 8, 2001, Bear, Stearns & Co. expressed optimism about the strategic plan:

> In our view, the company is in a 'new and improved' incarnation and, as a consequence, its shares represent compelling value (although not without an element of turnaround-related risk) at current levels.
>
> *        A PROMISING RESTRUCTURING. Fleming has undertaken an ambitious plan to restructure many of its business and strategic practices. We view the plan very positively and are confident that its new management team, under the dynamic leadership of Mark Hansen, who joined Fleming from Wal-Mart in 1998, has the operational and strategic expertise to carry it to fruition.
>
> * * *
>
> Indeed, the combination of revenue growth from new customers, the shift to value retail, and sizable cost savings related to the strategic plan are already creating the momentum that we believe can propel Fleming's EPS to $3.00 or higher by 2003.
>
> In our view, Fleming is executing a significant turnaround in its core wholesale operations that we expect will lead to increasing revenue and improved margins. **The shift in its retail operations' focus, from conventional stores toward the Food4Less value model, should be another major growth driver as older, largely unprofitable stores are either sold or converted to the new model.** Thus, from this combination of a return to distribution revenue growth, significant

cost savings from the Low Cost Pursuit program, and the shift in focus of the retail operations, we believe Fleming's earnings are on track for sustained superior growth and the shares represent compelling value at current levels.

\* \* \*

... **We think the company's shift in strategy for its retail business presents another superb opportunity to turn an underperforming business into an outperformer.** As Fleming divests many of its conventional retail operations and converts others to the higher-margin Food4Less value model, while stepping up the rate of openings for the value retail stores, **we expect the retail division to become a significant driver of Fleming's incremental profitability.**

87.     On April 19, 2001, Deutsche Banc Alex. Brown issued a "buy" rating for Fleming. Its "positive investment thesis" was based on several factors, including the belief that "[t]he company has focused its retail efforts on the rapidly growing price-impact format, where stores are less expensive to build and operate and generally are cash flow positive within a year."

88.     On July 25, 2001, UBS Warburg initiated coverage of Fleming with a "buy" rating and a target share price of $40:

> Fleming is near completion of a major re-structuring of its distribution and retailing operations, a process which began in early 1998. The re-positioning of the distribution segment has resulted in the rationalization or consolidation of 12 of Fleming's full-line distribution centers, generating significant productivity gains and cost savings. **We believe that Fleming's decision to focus on the higher growth price impact format is consistent with food retail industry trends and will allow the company to achieve greater operational efficiencies and profitability while serving the needs of the rapidly growing price sensitive customer segment. We believe that Fleming's bold initiatives will yield continued earnings growth and improve the company's overall competitive position.** We estimate that Fleming can achieve $1.97 in EPS for 2001 and $2.57 in 2002, based on continued margin expansion, new customer acquisitions in the distribution segment, and continued growth of the price impact retailing format. ...

89.     On October 22, 2001, Morgan Stanley issued a report rating Fleming "outperform" with a stock price target of $38, based in part on the conversion of Fleming's retail stores to a "price impact" format:

- **Fleming has a clearly focused retail business, in our view**
  FLM is aggressively growing its retail business, which is exclusively value oriented, an area where it has expertise. We see strong growth opportunities to grow "Food4Less" and "Yes!Less" formats.

- **We see a strong, 25% long-term EPS growth rate.**
  We expect FLM to benefit from recent alliances, efficiency initiatives, opportunistic acquisitions, and a growing retail segment.

90.    On February 19, 2002, Deutsche Banc Alex. Brown issued a report rating Fleming a "strong buy." Among the reasons forming Deutsche Banc's "investment thesis" was that "[t]he company has focused its retail efforts on the rapidly growing price-impact format that caters to consumers who are more price sensitive. These stores are less expensive to build and operate and generally are cash flow positive within a year."

91.    On April 25, 2002, Wachovia Securities issued a report with a "buy" rating for Fleming. This rating was based in part on Wachovia's "view that the company is poised to expand its price-impact retail grocery business, further leveraging the company's supply-chain efficiencies." Wachovia's positive assessment of Fleming's earnings prospects were based in part on Fleming's retail plans: "We think anticipated EPS growth should be driven primarily by actions management has taken to position the company for distribution growth in multiple retail channels and by retail expansion."

92.    On June 19, 2002, with Fleming trading at $20.46 a share, Morgan Stanley, Dean Witter issued a report targeting Fleming for $27.00 a share. This target was based on Morgan Stanley, Dean Witter's positive assessment of the accomplishments of Fleming's strategic plan, including the retail strategy:

The New Fleming Is Better Positioned for Growth

At the end of 1998, Fleming set out on a new strategic path. Management laid out a four-point plan to 1) consolidate distribution operations, 2) grow

32

distribution sales, 3) improve retail grocery performance, and 4) reduce overhead and operating expenses.

The company's restructuring efforts are now complete, and we believe the company is now better positioned for long-term growth. The company closed 12 distribution centers between 1998 and 2000, boosting sales per distribution center from $389 million in 1998 to $640 million in 2001.

It has diversified its distribution business by focusing on new growth-oriented channels: supercenters, ethnic stores, convenience centers, etc. In its retail grocery segment, it has closed 238 conventional grocery stores, focusing on more profitable and faster-growing price-impact stores.

These changes have shifted Fleming from a business in decline to one of growth. ...

## VI.   Substantive Allegations

A.   **Defendants deliberately or recklessly misstated Fleming's earnings in 2001 and 2002.**

1.   **Defendants deliberately or recklessly misstated Fleming's retail sales and earnings.**

93.   Beginning by at least the first quarter of 2001, Fleming grossly overstated its earnings and margins in the retail segment, according to a former employee in Fleming's retail segment ("Source 1"). This employee, who was employed as a Fleming financial analyst manager from the fall of 2001 to the summer of 2002, was interviewed in connection with the allegations set forth herein.

94.   Another financial analyst manager in the retail segment provided additional information in connection with the allegations in this Complaint. The second financial analyst manager, who was employed at Fleming from the summer of 2001 to early 2003, is identified as "Source 4." Through the performance of their duties, both Source 1 and Source 4 acquired detailed information concerning the Company's accounting practices prior to their tenure with Fleming.

95.     According to Source 1, the financial analyst managers received detailed weekly reports from Fleming's retail stores and Fleming's "product category managers," who managed Fleming's sales of various product categories among the different stores.  These reports provided detailed information on Fleming's sales, expenses, margins, and earnings.  Fleming's financial analyst managers used this data to compile Fleming's actual revenue, costs, and margin.  Source 1 issued weekly, monthly, and quarterly reports showing the revenue, cost, and margin figures.  These reports were circulated to all of Fleming's top management, including defendants Hansen, Rider, Shapiro, Dahlen, and Davis.  Source 1 and the other financial analyst managers personally delivered these reports to the top Fleming executives.

96.     Although Source 1 worked in the retail segment, Source 1 knew that detailed financial analyses for the wholesale segment were provided, like the retail analyses, on a weekly or monthly basis to Hansen, Rider, Shapiro, Dahlen, and Davis, as well as other top Fleming executives.  The wholesale reports contained the same type of information that was provided in the retail reports.  Source 1 saw these reports in the executives' offices, and sometimes reviewed wholesale reports obtained by the retail CFO to assess the retail segment's performance in comparison with the wholesale segment.

a.      **Revenue and margin manipulations by Fleming retail.**

97.     The retail financial analyst managers reported directly to the CFO of Fleming's retail segment, although they also received direction from defendant Tom Dahlen, the retail president.  The retail CFO was John Simrell until June 2002, when he was replaced by Tim Otte.

98.     According to Source 1, prior to the closing of the Company's books for the various reporting periods, Simrell and Otte asked the financial analyst managers to perform analyses which would lead to false accruals of deductions, and ultimately inflate earnings.  These analyses were

driven by a desire to offset specific earnings shortfalls in the general ledger that was widely published within Fleming, including to defendants Hansen, Rider, Shapiro, Dahlen, and Davis. These analyses led to changes in the general ledger so that higher earnings could be reported at the close of the reporting periods. After Source 1 prepared Source 1's analysis, Simrell and Otte often required Source 1 to alter the analysis. Sometimes Simrell and Otte directed that a new revenue or margin number, which they supplied, be substituted for the original number in the analysis, while providing no basis or back-up documentation for the change. It often was impossible to provide any rationale for the new number. According to Source 1, defendant Dahlen was involved in the margin manipulations and always received from Source 1 the same information that Simrell and Otte received.

99.    At other times, according to Source 1, Simrell and Otte required the financial analyst managers to reduce accounts payable by a specified amount in order to "account" for "deductions" that Fleming planned to claim from as-yet-unidentified vendors, for as-yet-unidentified products. In the grocery industry, purchasers, including wholesalers and retailers, sometimes inform vendors that they are making "deductions" from invoices, usually to account for some special circumstance warranting a price reduction.  In standard industry practice, wholesalers and retailers provide vendors written notification of a proposed deduction to the vendors' invoices. These documents are commonly referred to as "debit memos." Valid debit memos arise primarily as a consequence of the return of merchandise (*e.g.*, damaged merchandise), adjustments for incorrect quantities invoiced (*e.g.*, for short shipments), adjustments for incorrect pricing (*e.g.*, prices that differed from the prices set forth in purchase orders), and adjustments pursuant to written contractual arrangements (*e.g.*, co-operative advertising agreements and volume discount agreements).

100.    According to Source 1, Fleming did not follow standard industry practice. Fleming didn't *propose* deductions at all. Instead, the deductions used by Simrell and Otte to reduce accounts payable were unilateral, were not valid debit memos and were not authorized by the affected vendors. Moreover, there was no basis for concluding that the vendors would accept the improper and baseless deductions. In fact, vendors did not accept them, and indeed often threatened to cut off the product supply to Fleming if Fleming did not remit the amounts which had been improperly deducted from the vendors' invoices.

101.    The deductions often had already been accrued by Fleming's accounting department by the time Source 1 was told to change Source 1's report, even though the vendor, the product, and the basis for the deduction had not yet been identified. The accrual of these unauthorized, improper, and unsustainable deductions was directed by defendant Tom Dahlen, the president of Fleming's retail segment, as well as Simrell and Otte. In fact, according to Source 1, Simrell and Otte often accrued deductions, and <u>then</u> asked the financial analyst managers and product category managers to determine which of the Company's vendors, if any, would be likely to accept the deductions.

102.    Dahlen, Simrell, and Otte manipulated earnings during the entire time that Source 1 worked at Fleming. Moreover, Source 1 believed, from his review of Fleming's financial documents, that the manipulation was occurring before he began work in October 2001.

103.    According to Source 1, each financial analyst manager had a deduction worksheet, which was reviewed by higher-level executives. By June 2002, Source 1 was emailing Source 1's deduction worksheets to Dahlen, Simrell, Otte, and the wholesale and retail category managers with a frequency of three to five times a week. Even after a deduction was rejected by a vendor and removed by Source 1 from the worksheet, the retail executives often reinstated the deduction.

36

Fleming's persistence in claiming unauthorized, improper, and unsustainable deductions sometimes prompted vendors to stop shipping product.

104.    Defendant Hansen sometimes personally directed unauthorized, improper, and unsustainable deductions.  For example, defendants Hansen and Dahlen directed Source 1 to deduct from vendors' invoices a "two case" deduction, based on the concept that vendors should provide new retail stores with two free cases of product.  Source 1 stated that 150 vendors were notified of the fact that Fleming was unilaterally deducting $3.5 million in "two case" deductions.  At the time Source 1 left Fleming in July 2002, around 125 vendors had responded and only $78,000 of the "two case" deductions had been accepted by the vendors.  In short, the "two case" deduction directed by defendants Hansen and Dahlen was overwhelmingly rejected by vendors.  However, the $3.5 million had already been accrued to increase earnings.

105.    Source 4 took over analysis of the "two case" deduction upon the departure from Fleming of Source 1.  Source 4 confirmed that the "two case" deduction was taken without vendors' approval, and largely was not accepted by vendors.  In mid-2002, Source 4 attended a meeting concerning the "two case" deduction at which a controller for the wholesale division said, "We've repaid every deduction we've ever taken."  Notwithstanding, Fleming didn't correct its financial statements to reflect any such repayments, nor did the Company stop taking the improper deductions.  According to Source 4, the controller was referring to Fleming's deduction practices as a whole, not just the "two case" deduction.

106.    According to Source 1, the 1934 Act Individual Defendants often participated in Monday meetings where the finances would be reviewed, along with Simrell and often the financial analyst managers.  At these meetings, the handling of deductions would be discussed.  Margins also were discussed.  At these meetings, the executives reviewed documents showing that sales in

Fleming's retail segment were flat or declining, and that there was a difference between publicly reported margins and internally calculated margins. On more than one occasion when these topics were discussed, Hansen was present.

107.   According to Source 1, when Fleming made public disclosures, Fleming's financial analyst managers saw that the margins reported for Fleming retail were not the true margins for Fleming retail. The reported retail margins were higher than those reflected in the internal analysis of Fleming's financial analyst managers. This discrepancy was due to manipulations made by Simrell and Otte and directed by defendant Dahlen.

108.   According to Sources 1 and 4, the actual experienced earnings shortfalls also were apparent in Fleming retail's performance in comparison to the budget plan prepared by the financial analyst managers, including Sources 1 and 4 for 2002. This budget plan, and earnings reports showing the failure to meet Plan, were circulated to, among others, defendants Hansen, Rider, Shapiro, and Dahlen. According to Sources 1 and 4, Fleming's retail earnings fell well behind the planned earnings from the beginning of 2002.

109.   Source 1 stated that auditors from D&T sometimes requested back-up for accrued deductions. Source 1 would provide them this information. However, the auditors never asked Source 1 any questions about the deductions that they supposedly were examining.

110.   According to Source 1, on more than one occasion in late 2001 or the first half of 2002, John Simrell hired D&T consultants to validate deductions claimed by Fleming retail. Source 1 provided information to D&T consultants who were attempting to validate these disputed deductions.

111.   On at least two occasions in the first half of 2002, Fleming retail had a dispute concerning deductions with Fleming wholesale, according to Source 1. Simrell hired D&T on those

occasions to prove that Fleming wholesale owed millions of dollars in deductions that Simrell believed Fleming wholesale had failed to pass through to Fleming retail. From this experience, D&T should have learned that Fleming wholesale was receiving deductions or rebates that it was not passing through to retailers, and that Fleming's business was so troubled that wholesale and retail were feuding over allocation of earnings.

112.   As confirmed by Source 1, Fleming wholesale and Fleming retail often took deductions on the same product. For example, Fleming wholesale often took a deduction from a vendor on product that it had sold to Fleming retail. Fleming retail would take deductions from the same vendor for product purchased by Fleming retail directly from that vendor, as well as the product that Fleming retail had purchased from Fleming wholesale. As a result, Fleming's books often reflected a double accrual of deductions for a single product.

113.   According to Source 1, the effect of reversing the accrual of the unauthorized, improper, and unsustainable deductions would have been devastating to Fleming retail's profit and loss statement. Such a change would have caused Fleming retail to go from positive earnings to substantial negative earnings.

114.   The push for unauthorized, improper, and unsustainable deductions in Fleming's retail segment reflected serious company-wide problems. In February 2001, Fleming's wholesale group announced that it had entered into a contract to supply all of Kmart's grocery needs. This contract comprised a significant portion of Fleming's wholesale revenue. However, according to Source 1, in order to obtain the Kmart contract, Fleming had to cut its margins to the bone. As a result of declining margins due to the Kmart contract, Fleming required the retail segment to book more and more deductions in order to prop up company-wide margins. The culture of the Company

was so diseased and the push for deductions so intense that Fleming's retail segment even accrued large disputed deductions on its purchases from Fleming's wholesale segment.

b.    **Manipulation of same store or comparable store sales.**

115.    According to Sources 1 and 4, Fleming manipulated its "same store" sales data to show increases in same-store sales. "Same store" or "comparable store" sales are sales at certain specified stores that were open during two reporting periods that are being compared. Analysts and investors look at "same store" sales trends to get a true picture of whether a retailer's business is improving.

116.    The determination of which stores to include in "same-store sales" figures is dictated by industry standards. For example, stores are not included in "same-store sales" figures until they have been open for twelve months, because first-year store revenues can be inflated by volume generated by store-opening promotions.

117.    According to Source 1, Fleming's financial analyst managers tracked the real same-store sales data, and this data consistently showed large declines in same-store sales. It was apparent that customers were reacting negatively to the price-impact format of Fleming's stores. Every time a store was converted to the price-impact format, it eventually fell into a loss, while the full-service stores were still performing comparatively well. Sometimes sales would fall after a store's conversion to a price-impact format to less than half what they had been prior to the conversion. One major problem was that the price-impact stores often sold products at higher prices than conventional grocery stores, thus undermining their purported purpose and the competitive advantage which defendants touted.

118.    According to Source 1, defendant Dahlen, Simrell, and Otte on numerous occasions manipulated the publicly reported same-store sales figures in order to hide the adverse sales trend.

They made these manipulations by, among other things, their selection of stores to include in same-store sales figures. They rejected the data obtained from the financial analyst managers, and instead changed the composition of the population of stores which constituted the Company's "same stores." For example, Dahlen, Simrell, and Otte often commingled better performing new stores' revenue and earnings with current-year "same store" revenues, in order to inflate current-year same-store revenues and earnings and create the false impression of growth. As a result, Fleming's same-store revenue and earnings reports did not truly reflect a "same store" comparison as is commonly understood in the retail industry.

119.   According to Source 1, in November 2001, Fleming's retail financial analyst managers expressed concern to John Simrell that Fleming's retail segment was over-reporting the strength of its sales, especially its "comparable store" sales. Simrell told the financial analyst managers not to raise concerns, or they would lose their jobs.

120.   According to Sources 1 and 4, beginning in 2001 and continuing into 2002, Fleming also inflated its same store and/or comparable store sales figures by including certain sales, referred to internally as "red tag" sales. These were one-time transactions in which Fleming purchased and immediately sold large lots of a commodity, such as video cassette recorders or television sets, which had been located for Fleming by a broker. Even though red tag sales were not made through any Fleming retail store, Fleming would falsely attribute the revenue from these sales to the retail stores included in its same store and/or comparable store analyses, thereby inflating the total amount of same store and/or comparable store sales. In addition, according to Source 1, in at least one instance in late 2001 or early 2002, Fleming – at the direction of Dahlen and Simrell – reduced the previously reported same store sales for the year 2000 fiscal year by subtracting $1.3 million in red tag sales while at the same time inflating the 2001 figure for same store or comparable store sales

by at least $4.7 million in red tag sales. In this way, the total same store and/or comparable store figure for 2001 was falsely inflated, and the growth for the same store or comparable store figure was also falsely inflated. As a result, the market was misled about growth in same store sales.

121.    In addition to declining sales, Source 1 saw from data provided by category managers that expenses remained very high at the price-impact stores, despite public statements about reduced expenses resulting from conversion to the price-impact formats.

122.    Source 4 has provided additional information demonstrating that same-store sales were declining during the Class Period. From July 2001 through the end of the Class Period, Source 4 was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the Company. Hard copies of these reports were given directly to defendants Hansen and Rider, and electronic copies were provided to defendant Dahlen.

123.    Source 4 confirmed that same-store sales would have declined throughout the Class Period but for the effect of "red tag" sales and sales obtained through a practice called "diverting." "Diverting" was a practice whereby Fleming's retail operations would purchase product and resell it at a higher price to a company called Damon & Associates. Fleming would not take possession of this product, and this product would not be sold through Fleming's stores. Therefore, revenue from "diverting" was not properly included in "same store" sales, but Fleming nevertheless did include this revenue in "same store" sales.

124.    At the beginning of 2002, in preparing his weekly, monthly, and quarterly "same store sales" reports, Source 4 began breaking out red tag and diverting sales into a separate category. This practice demonstrated to recipients of the report – including defendants Hansen, Rider, and Dahlen – that Fleming was including sales in its "same store sales" data that were not attributable to any stores. Moreover, according to Source 4, once "red tag" and diverting sales were separated

42

into their own category, it was apparent from the face of the reports that same store sales were declining.

125.    Source 4 stated that Source 4 was given "red tag" sales numbers by John Simrell. When Source 4 was first given "red tag" sales numbers by John Simrell, Source 4 asked Simrell what "red tag sales" were. Simrell answered: "You don't want to know."

126.    Source 4 stated that defendant Dahlen required that red tag and diverting sales be included in publicly reported same-store sales data.

127.    In addition to separately listing "red tag" and diverting sales, Source 4's same store sales reports in 2002 listed same store sales separately in each of Fleming retail's seven regions. These reports showed from the beginning of 2002 that overall same store sales were declining. Only two regions – Northern California and Southern California – had mildly positive same-store sales trends. The other regions showed declines in same stores sales, and some of the regions showed deep declines. Some regions had year-on-year declines of up to twenty percent.

128.    Source 4 stated that Source 4's regional same-store sales data reflected manipulations required by defendant Dahlen. For example, new stores in Arizona were being compared with old stores located within two to five miles of the new stores, but which had been closed two or three years before the comparison. Thus, the same-store sales did not even reflect sales for the *same* stores. Rather, they compared sales at stores in their *first* year of existence with sales at stores in their *last* year of existence. According to Source 4, this manipulation was approved by defendant Rider.

129.    According to Source 4, in 2001 and 2002, a new store's sales would be included in "same store sales" calculations when the store had been open for only a week.

43

130.    In short, even the negative same store sales data reflected in Source 4's 2002 reports overreported the strength of same-store sales, because the data incorporated the manipulations required by defendant Dahlen.

131.    Defendant Hansen was even more aware than Sources 1 and 4 about the declining sales trends, because, according to Source 4, Hansen frequently received special sales reports giving even more current information than the financial analyst managers received.

132.    According to Source 4, the sales trends clearly showed that the price-impact format was not working.  For example, when the stores in the Minnesota and Milwaukee divisions converted to the price-impact format in 2001 and 2002, their sales declined by up to forty percent. Similarly, new price-impact stores in Arizona and Utah performed poorly.  Source 4 – who was responsible for compiling sales data for all Fleming retail stores – cannot recall any new price-impact stores performing well.

133.    Between July 2002 and September 2002, defendant Hansen asked Source 4 to chart the trends in sales for newly-opened price-impact stores.  Ideally, the trend would take the shape of a hockey stick, with high initial sales, followed by a decline, and then a steady increase.  Using data that had been available to defendants Hansen, Rider, and Dahlen prior to July 2002, Source 4 demonstrated instead that the sales for a typical Fleming store declined consistently after opening, and never increased.  Thus, Source 4 demonstrated that the data available to Hansen, Rider, and Dahlen over the previous two years revealed consistent sales declines and the ineffectiveness of the price-impact format.

134.    In 2001 and 2002, Source 4 prepared pro formas for stores that Fleming was considering purchasing.  These pro formas were provided to the Business Development Committee of the Board of Directors to justify purchases of the new stores.  The pro formas were based on sales

44